## Morton vs. Rutherford and another.

Under chap. 172, Laws of 1851, it was sufficient to avoid a contract for the repayment of borrowed money, if the money was loaned upon an oral agreement to pay a value beyond the legal rate of interest, although the note or other written evidence of indebtedness executed by the borrower, provided for the payment of only the legal rate.

Chap. 55, Gen. Laws of 1856, declares that "all bonds, bills, &c., whereby there is reserved or secured a rate of interest exceeding twelve per cent., shall be valid and effectual to secure the repayment of the principal sum loaned," &c. *Held* that this act could not render valid a bond, bill or other instrument previously executed, and which was void by the act of 1851.

APPEAL from the Circuit Court for *Jefferson* County.

This action was brought in February, 1862, to foreclose a mortgage executed by the defendants *Douglass Rutherford* and *Elizabeth*, his wife, August 11, 1855, to secure payment of a

Morton vs. Rutherford et al.

note of the same date made by *Douglass Rutherford* to the plaintiff for $1,260 with interest at twelve per cent. The answer alleges, in substance, that the note and mortgage were executed in pursuance of a usurious agreement between the parties to the note, that the maker should pay and the payee should receive for the loan of the principal sum mentioned in the note, interest at twelve per cent. per annum as expressed in the note itself, and that the maker should, in addition, deliver to the payee in each year from the date of the note until its maturity, twelve cords of firewood ; that, in pursuance of said agreement, defendant did deliver to plaintiff, in each of the winters of 1855–6, 1856–7 and 1857–8, twelve cords of firewood, worth $1.50 per cord. For a second defense, the answer alleges that said note and mortgage were executed solely to secure the plaintiff for certain advances made by him for said defendant, and that the whole amount of those advances was $1107.60, which was the sole consideration for said note and mortgage.

. On the trial, the plaintiff read in evidence the note and mortgage described in the complaint, and, as a witness in his own behalf, testified that the sum of $1611.64 was then due on the note, and rested. The defendant, as a witness in his own behalf, testified as follows : " The understanding with the plaintiff was, that he was to let me have money enough to pay one note for $666.66, and one for $300, which George Dow held against me; and I was to pay him twelve per cent. interest in money annually, and twelve cords of fire wood, to be delivered at plaintiff's house, in Cambridge. It was agreed that I should give the note and mortgage. Plaintiff paid money to Dow at different times till he took up the two notes. He then came to me and wanted the note and mortgage, and named Brown's office as the place where they should be made. I went to Brown's office, and the note and mortgage were there drawn by Mr. Brown, all but signing, and were then taken to my house, where they were signed by myself and wife. When Brown commenced drawing the papers, he asked how much

interest was to be paid. *Morton* said twelve per cent. Brown asked if that was all, and plaintiff said there was a wood dicker. Brown said, 'The understanding is, you are to pay twelve per.cent. and wood?' Plaintiff said, 'Yes, wood worth twelve shillings per cord.' I delivered the twelve cords of wood for three years at the plaintiff's house, as stated in my answer, on the agreement. The agreement was made in the spring of 1855. Plaintiff came to where I was cutting wood, and spoke about the money. I had seen him before about it. He said if he let me have the money I must pay him twelve per cent. and give him twelve cords of firewood each year; that money was worth more than twelve per cent. I told him that was pretty hard, but I had got to have the money, and I would do it if I could be sure of the money. William Martin was present at the time; also George Taylor." The defendant then read in evidence the depositions of William Martin and Isaac S. Brown. Martin testified as follows: " I lived with *Douglass Rutherford* during the summer and fall of 1855. I was present when an agreement was made between him and *William Morton*, the plaintiff, for a loan of money. The terms were, that *Rutherford* could have the money at twelve per cent. per annum interest, and that he was to give a mortgage upon his farm. *Rutherford* said he wanted the money to pay to the person from whom he had purchased the farm. This took place during the fall of 1855, but I cannot recollect the precise month. The agreement was verbal, and was made in the woods where we were cutting wood, on *Rutherford's* farm. *Rutherford* agreed to give *Morton* twelve cords of wood per year in addition to the twelve per cent. interest until the principal and interest were paid; the wood to be delivered at his house for the use of his family. There was no time specified for its delivery. I delivered the first load of wood at plaintiff's place under that agreement." In reply to cross-interrogatories he said: " I was in the defendant's employ about one year or more. I do not recollect the day or month when I left him, but it was in the fall of 1856. It

was after harvest. I do not remember the day or the month when the agreement was made between *Rutherford* and *Morton*, but it was in the fall of 1855. The whole of the conversation that I heard was, that *Rutherford* was to have the money at twelve per cent. per annum, he furnishing *Morton* twelve cords of wood per year in addition to the interest money agreed on. George Taylor, who was also in *Rutherford's* employment, was in company with us, chopping wood a little way off; but whether he heard the conversation or not I am unable to say. *Ratherford* was with us chopping wood when *Morton* came up. *Morton* said, 'You want some money?' *Rutherford* said he did. *Morton* said, "You can have it, but you must pay me more than twelve per cent. for it; you must let me have some wood in addition.' *Rutherford* said 'How much?' *Morton* said he thought it would take about twelve cords a year to supply his family. *Rutherford* said it was pret-ty tough, but he must have the money, and he agreed to the terms."—Isaac S. Brown (whose deposition was taken in Cali-fornia) deposed as follows: "To the best of my recollection, and as appears from my account book, which I have here, on or about the 11th of August, 1855, I drew a promissory note which *Douglass Rutherford* executed and delivered to the plaint-iff, together with a mortgage on the lands on which the defend-ant resided at that time. I think I drew the note and mort-gage in my office in Cambridge, at the suggestion of the plaint-iff and *Douglass Rutherford.* Whether it was signed, sealed and delivered at my law office or at the residence of the de-fendant, I do not really remember, but my best recollection of that is, that I drew them and went to the house of defendant to have the mortgage signed and to take acknowledgment. * * To the best of my recollection, the agreement was, that plaintiff was to pay to George Dow a certain balance due him from de-fendant, and take a mortgage on defendant's land; and whilst talking on the subject plaintiff said he did not like to let money for less than twenty five per cent., but as the law was then so

severe on usury, he did not want to taint his mortgage with usnry, and would not put into the papers any more interest than the law allowed. * * To the best of my recollection the plaintiff at that time told the defendant that if he would give him twelve cords of wood yearly, and deliver it at his house, he should have the money at twelve per cent. per annum, to which *Rutherford* agreed, and I drew the note and mortgage, which defendant executed. * * To the best of my recollection this conversation took place just previous to my drawing the papers, when plaintiff and *Douglass Rutherford* were present. Defendant's wife was not present that I recollect, nor do I recollect that any one else was there; there might have been for aught I know. * * I know of the defendant drawing and piling wood at plaintiff's house, one or two winters at least, subsequent to the execution of the note and mortgage—I think in 1857, 1858 and 1859; bnt how much each winter I do not know. It made quite a long pile. * * I have never heard plaintiff state the bargain or admit anything about the agreement since, that I now recollect, except a passing remark that defendant owed him some wood, and was to deliver it at his house. A long time has elapsed since the transaction, and my recollection is not very clear on the subject, nor should I have remembered so much as I have, had it not been impressed on my mind by knowing the fact that defendant was a shrewd money shaver, and took all the advantage of the law he could in loaning money. I have no interest in this suit, nor have I any bias or prejudice against either of the parties." J. S. Townsend, for the defendant, testified: "In 1855 I resided in Cambridge, across the street from plaintiff, and have resided there ever since. Saw defendant draw cord wood to plaintiff's house in the winters of 1856, 1857 and 1858. Heard plaintiff say he had about twenty cords one year. Defendant drew from twelve to twenty cords each winter." The plaintiff then read in evidence the deposition of one Mariah Lunderville, which was in substance

as follows: "I have known the parties of this suit eight or nine years. Knew them at Cambridge, in this state. Resided there in 1858. Heard *Douglass Rutherford* say that plaintiff had never charged him more than twelve per cent. for borrowed money. This was at his own house, July 6, 1858. Mrs. George Dow was present, also *Mrs. Rutherford* and myself. Mrs. Dow asked defendant what rate of interest he was paying the plaintiff, and he said twelve per cent., and that plaintiff had never charged him more than that. I was knowing to *Mrs. Rutherford* getting money of the plaintiff for which she was to pay him in wood, to be delivered at the house sometime in January, 1857." The plaintiff was recalled as a witness in his own behalf, and said: " I moved to Cambridge in Dane county, from Illinois, in March, 1855. I was visiting my brother who resides near Cambridge, in January, 1855. While there my brother spoke to me about lending his neighbor, *Rutherford*, some money. He told me that his farm was likely to be sold unless he could borrow some money; that it was the old Judge Dow farm, and good security. *Rutherford* came to brother's house the same day or the next, and told me that he owed George Dow somewhere in the neighborhood of $2,500; that about $1,200 of it came due about the 10th of August next following; that he wanted to borrow money enough to make that payment in August, and give a mortgage subject to the balance due Dow. I told him my brother had spoken to me about his case, and I could let him have it. He asked me what rate of interest I charged. I told him twelve per cent. He then asked me if he could rely on getting the money at the time agreed upon, and I told him he could if everything was all right as he had stated. There was not one word said about his delivering me any wood in addition to the twelve per cent. interest, then or at any other time. I do not recollect of ever talking again with *Rutherford* about this contract until the 10th of August, 1855, in Cambridge, when his brother Joseph was with him. I asked him if he knew that was the day

on which he was to receive that money, and he said no. I told him it was ready, and had been. He said he would go and see Dow, and have the business done immediately. He came to my house shortly afterwards, the same day, and told me Dow would not receive the money, and requested me to keep the money until Dow would take it, and he would pay me interest from that date until Dow would take it. The next day I met Dow and Mr. Boyington going towards Brown's office. Dow said to me, "Are you going to pay me some money for *Mr. Rutherford*?" I said no, but that I had money I was going to lend him, for which he was going to give me security on his farm, and whenever he did that, the money was ready. Dow told me he would like the money that day—he could use it. I then turned and went with them to Brown's office. They did not go in. I found Brown there. Asked him if he was busy, and told him if he would walk down to *Rutherford's* with me, he would get a chance to draw some writings. He said he would. I told him to take a blank mortgage with him, which he did, and Brown and myself went directly to *Rutherford's* house; found him in his house, and his family and George Taylor and wife were about the house. I told *Rutherford* that Dow was ready to receive the money, and that he had better get his deed to make his mortgage by, which he did, and Brown sat down to the table and drew the mortgage and note for $1,260, which were then and there executed by *Rutherford* and his wife. I paid that $1,260 as follows: About the 1st of April, 1855, at *Rutherford's* request, I had bought of Dow a note made by *Rutherford*, for $300 and interest, which I then held. I also had a note of his, bought of Stag, which I think was about $50, but have no memorandum: $8.80 I had paid to Plumb, of Lake Mills, for fruit trees. The balance of the $1,260 I paid to *Rutherford* in cash or drafts, afterwards on that day, at my house. I never paid any money to Dow for *Rutherford*, except the $300 note referred to and about $60 I paid a number of years afterwards. I gave *Rutherford* at the time a

statement of the items composing the $1,260, but have no copy. I never had a note against *Rutherford* in which E. Morton was interested, for $336 or any other amount. I had no note against him for $161.20. I never paid $90 cash to Dow. I never received a stick of wood as additional interest on the note and mortgage, and the thing never was mentioned by either party. I sold a stove to *Rutherford* in October, 1855, for $7, to be paid for in wood at $1.50 per cord. This was paid for in wood in the winter of 1856–56, and afterwards, during the same winter, I bought eight cords more at the same price, and paid *Rutherford* for it in cash at the time as officer of the school district board. I bought of him ten cords more the same winter at $1.50 per cord, which I paid for as treasurer of said district, and have the order which I paid. [The order was here produced, but is not inserted in the printed case; and the original bill of exceptions is no longer found on the files of this court.] In 1856 and 1857 I bought ten cords more at $2 per cord, for cash—*Rutherford* and H. H. Potter giving me a joint note for $20, payable in wood at $2 per cord that winter; and at the same time I advanced *Rutherford* about $100 to bear his expenses to California, for which he and Potter gave another joint note of $88.96, due in a year. This was all the wood I bought that year of *Rutherford*. These notes for wood and money were given for the money advanced by me to *Rutherford* as above stated. In 1857, while *Rutherford* was in California, his wife wanted me to let her have some goods at the store where I was selling goods on administrator's sale. I let her have goods and money—I think eight or nine dollars—and told her she could pay it in wood. When *Rutherford* returned in 1857, I told him what I had done, and he said it was all right, and that fall or winter paid for the same in wood. In 1857 I also had bought and held five notes against *Rutherford*, amounting to $119.00. [Witness describes the several notes.] What wood he delivered me in 1857 and 1858 was paid for by the notes; but I do not recollect and have no memorandum

of the amount of wood delivered in those two years, except the $20 note given for wood, as I have already stated. In the winter of 1855-6, I saw H. H. Potter and *Rutherford* passing my house in Cambridge, when I notified *Rutherford* to call and get his money for the wood he had drawn me, or I should spend it, or words to that effect. I paid *Mr. Rutherford* for every stick of wood he ever drew to my house or for me, and he never agreed to draw any wood as extra interest on the note and mortgage, and it never was talked so."—George Dow, for plaintiff, testified: "In 1855 I held notes and mortgages against the defendant to the amount of about $2,300. *Morton* paid a note of $300. [Two notes produced and shown witness, one for $300, and the other for $666.66.] These are the notes held by me against *Rutherford*, secured by mortgage. The $300 note was paid me by *Morton* in the last of March, 1855. Don't recollect that *Morton* paid anything except that note prior to August 11, 1855. All these notes were not paid until a year or two ago. On the 11th of August, 1855, I saw plaintiff and *Rutherford* going out of Brown's office towards *Rutherford's* house; think Brown had paper in his hand. *Rutherford* told me early in the spring of 1855, prior to the payment of the $300 note by *Morton*, that he was going to have some money of the plaintiff. I had conversation with him in 1857 or 1858 about the interest he was paying *Morton* for money. I asked him if *Morton* was taking more than twelve per cent. interest, and he said no. He seemed to have more confidence in *Morton* than in me. I asked him how much interest he paid *Morton*, and he said twelve per cent. My papers were drawing ten per cent. interest, and *Morton* offered to buy these papers of me if I would make it twelve per cent. interest. I don't know who paid me the indorsements on the note of $666.66, made August 10th and 11th respectively, for $90 and $560.-37."—H. H. Potter, for plaintiff, testified: "I was in the employ of the defendant in 1855. Knew that he had a stove of plaintiff, for which he was to pay $7 in wood. I drew the

wood, by *Rutherford's* direction, at $1.50 per cord. Think I drew eight to twelve cords, same season, after paying for the stove. Heard plaintiff tell defendant to call and get money for wood or he would spend it. I had a conversation with *Rutherford* in 1856, in regard to the interest he was paying *Morton*. He said he was paying him twelve per cent. I drew ten cords of wood to plaintiff to pay the $20 note given by *Rutherford* and indorsed by me in the winter of 1856-7. I also drew six cords additional on my own account, for which plaintiff paid me $12."—E. Morton, for the plaintiff, testified: "I am a brother of the plaintiff, and reside in Cambridge. He came to visit me in January, 1855. I had a conversation with the defendant during that month about having money from him. I told defendant of my brother, and he came to see him. He said Dow had a mortgage on his farm due August 10, 1855, and he wanted money at that time. Plaintiff said he might rely on having the money, if everything was as he represented. *Rutherford* asked how much interest he would charge; plaintiff said twelve per cent., with security on land. *Rutherford* said he would like about $1,200—that Dow had part of his land, and he was afraid he would get the rest. Nothing was said about wood."—William D. Potter, of the firm of Potter & Stag, testified that they had a note against the defendant for $39, which they sold to the plaintiff in the spring of 1855, and that it was not "sold at a shave."—The defendant introduced in evidence two notes executed by him to George Dow; one of which was for $300, dated Dec. 19, 1854, payable in three months from date, with interest at twelve per cent. from August 10th, 1854; the other was for $666.66, dated Dec. 17th, 1854, payable August 10th, 1855, with interest at twelve per cent. from August 10, 1854. Both notes were paid and cancelled, and it appears that upon the second there were indorsed two payments, of $90 and $560.37, made respectively on the 10th and 11th of August, 1855. George Dow testified, for the defendant, that those indorse-

ments were made by him at their dates, and that the $90 were paid by the plaintiff. *Douglass Rutherford*, being recalled, testified "that one of the notes for wood executed to plaintiff by himself and Potter was not given for money loaned him, but to secure the payment of wood agreed to be paid for the loan of money mentioned in the note and mortgage in this case."—Mr. Vanhousen, for the defendant, testified that in the summer of 1855 he saw the plaintiff and defendant together in the office of Mr. Brown, and that Brown was with them and busy writing; but witness could not tell the month nor what paper he was drawing.

The circuit court found, in substance, that the allegations of the complaint were true; that there was then due the plaintiff upon the note described in the complaint $1611.54; and that the facts alleged in the answer as a defense were wholly unproven. Judgment according to the prayer of the complaint; from which the defendants appealed.

*Enos & Hall*, for appellants:

The note in suit, if usurious, is absolutely void. Sec. 4, ch. 172, Laws of 1851. The repeal of this section by ch. 55, Laws of 1856, if in force at the commencement of this action, would not cut off the defense. *Gorsuth v. Butterfield*, 2 Wis., 237. But the law of 1856 was repealed, and said sec. 4 re-enacted, by ch. 160, Laws of 1859, so that the statute was the same when this suit was commenced as when the note was made. *Simonton v. Vail*, 11 Wis., 90. 2. An oral promise, separate from the note, to pay more than twelve per cent., made the note usurious; and it is immaterial whether the sum or thing promised has been paid or not. 2 Parsons on Con., 390; *Gillmore v. Woolcock*, 13 Wis., 589; *Macomber v. Dunham*, 8 Wend., 550; *Hammond v. Hopping*, 13 id., 505.

*N. S. Murphy*, for respondent:

1. Usury is an unconscionable defense, and is not to be favored, and must be proved as laid beyond any reasonable doubt. *Beach v. Fulton Bank*, 3 Wend., 587; 1 Paige, 429.

2. By the law of 1851, a contract to receive a greater rate of interest than 12 per cent., unless embodied in the written instrument, did not avoid it. It is only when the excess of interest is secured "thereupon or thereby," that the note is avoided. The law is severely penal, and should be strictly construed. *Curtis v. Leavitt*, 15 N. Y., 151. 3. The law of 1851 had been repealed before the commencement of this action. Laws of 1856, ch. 55. This repeal, without any saving clause, took away the right to interpose the defense. 35 Barb., 599; *Key v. Goodwin*, 4 Moore and Payne, 341; *Butler v. Palmer*, 1 Hill, 334; *Central Bank v. Empire Stone Dressing Co.*, 26 Barb., 23, 36; *Curtis v. Leavitt*, 15 N. Y.. 9, 85, 151–154; *The People v. Livingston*, 6 Wend., 526.

*By the Court*, COLE, J. However unconscionable the defense of usury may be in the light of morals and good conscience, yet it is very clear that courts have no duty but to enforce it when clearly established, so long as prohibitory laws upon the subject are enacted by the legislature. In this case, if the contract set forth in the answer was really made as therein stated, there cannot be a particle of doubt but it was usurious. The counsel for the respondent argues that because the contract to receive a greater rate of interest than 12 per cent. was not embodied in the note and mortgage, therefore it does not fall within the prohibition of the usury law of 1851. But this is a mistake, and contrary to the construction which we have uniformly placed upon that statute. That law unquestionably prohibits a loan of money for a greater rate of interest than 12 per cent., and avoids the entire contract where more than that rate is reserved and agreed to be paid. Courts have uniformly held that it was entirely immaterial in what manner or under what pretense the usury is taken. From the necessity of the case they disregard the form and examine into the real nature and substance of the transaction. We have no idea that the statute renders only those usurious contracts void where,

the usury appears upon the face of the instrument. It is lev-
eled at all usurious contracts, and renders them void. And it
is quite immaterial that a portion of the contract is evidenced
by a note and mortgage bearing a rate of interest the parties
were permitted to contract for, if there is in addition a separate
oral promise to pay usurious interest. The law condemns the
whole transaction, and visits it with the penalties of usury.
So that if we are satisfied from the testimony that the real
contract was, that the borrower should pay the principal sum
mentioned in the note with 12 per cent. interest from date un-
til paid, and in addition thereto was to deliver the lender twelve
cords of fire-wood each year until the maturity of the note,
and that these were the conditions of the loan, there can be no
doubt but the contract was usurious and rendered void by the
law just cited. Does then the evidence show that such was the
real agreeement and contract of the parties in respect to the
loan? This question we think must be answered in the affirm-
ative. It is true that there is something of a conflict upon
the point, but to our minds the decided weight of testimony is
in support of the answer. The respondent swears that he was
to receive only 12 per cent. interest for the use of his money,
and that there was no understanding or agreement that he was
to receive in addition wood or anything else as a consideration
for making the loan. There are some improbabilities about his
statements, especially those relating to what occurred on the
10th and 11th of August, when the transaction was finally con-
summated, which tend to shake the credibility of his testimony.
And it is but fair to add that his testimony derives some sup-
port from that of several other witnesses, who swear to declar-
ations or admissions of the appellant that he was to pay only
12 per cent. interest for the use of the money. But this species
of evidence is always very unreliable, for the most obvious
reasons. On the other hand, the appellant swears positively
that the agreement was, that in addition to the 12 per cent. in-
terest stipulated in the note, he was also to pay twelve cords of

fire-wood per annum till the maturity of the note. His testimony as detailed in the bill of exceptions will bear scrutiny quite as well as that of the respondent. But moreover he is sustained by the direct and positive evidence of Martin and Brown, who swear as to what the contract was. They are disinterested and impartial parties, so far as we can discover, and speak in regard to facts of which they profess to have been personally cognizant. It is not possible for them to have been mistaken as to the terms of the agreement, and what rate of interest the respondent exacted for the use of his money. The nature of their testimony is such that it must either be accepted as the most direct and satisfactory of human testimony, or must be utterly rejected as totally false. We see nothing in the case which authorizes the inference that these witnesses were guilty of perjury. We are disposed to accept their statements as being substantially correct, particularly as there are no opposing circumstances which overcome or counterbalance them.

Subsequent legislation is relied on to show that the defense of usury is not available. By the law in force at the time the contract was made, it was usurious and void. To the same effect was the law when this suit was commenced. And by the law of 1856, a usurious contract was declared valid and effectual only to secure the repayment of the principal sum loaned. But how this latter enactment, even if it attempted it, could render valid an antecedent contract which was void, we do not comprehend. But the law of 1856, which has been abrogated, can have no bearing upon the question. The defense of usury is doubtless available, and we are constrained to say that it is fully established by the evidence in the cause.

The judgment of the circuit court must be reversed, and the cause remanded with directions to enter judgment for the appellant, declaring the note and mortgage set forth in the complaint void on the ground of usury.